Scott C. WHEELAN, et al., Plaintiffs,

v.

Stanley B. SESSIONS,
et al., Defendants.

No. Civ.A. 98–D–545–S.

United States District Court,
M.D. Alabama,
Southern Division.

March 16, 1999.

Jerry R. Herring, Dothan, AL, for plaintiffs.

Kevin Walding, Dothan, Alabama, for defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is a Motion For Summary Judgment with accompanying Brief In Support Of Motion For Summary Judgment ("Defs.' Br."), filed by Defendants Stanley B. Sessions ("Mr.Sessions"), Lynn D. Sessions ("Mrs.Sessions"), and Argonaut Relocation Services ("Argonaut") (collectively, "Defendants") on December 30, 1998. Plaintiffs Scott Wheelan ("Mr.Wheelan") and Leann Wheelan ("Mrs.Wheelan") (collectively, "Plaintiffs") filed a Response on January 29, 1999. Defendants filed a Reply on February 8, 1999. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion For Summary Judgment is due to be denied.

### JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The Parties do not contest personal jurisdiction or venue.

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (citing Fed. R.Civ.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P.

56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## FACTUAL BACKGROUND

Defendants Mr. and Mrs. Sessions purchased a lot and built a house thereon in March 1991. (Pls.' Resp. at 1.) They lived on the property until August 1997. Throughout the time they lived on the subject property, Mr. and Mrs. Sessions experienced drainage problems on the land. (Mr. Sessions Dep. at 13, 14, 15.) For instance, whenever it rained, water stood on the property and the ground became soggy and marshy for some time after the rain, the length of time depending on the amount of rain. (*Id.* at 14, 15.)

The subject property has a creek on the rear of the property. (Pls.' Resp. at 2.) In 1995, the creek rose above the banks during a hurricane. (*Id.*) Thereafter, the City cleaned out a drainpipe at a nearby road, and the creek has not presented any subsequent problems. (*Id.*) The subject land, however, continued to have drainage problems. (Mr. Sessions Dep. at 17, 22.)

In June 1997, Mr. Sessions was transferred by his employer, General Motors Acceptance Corporation ("GMAC"), to Georgia. (Mr. Sessions Dep. at 25, 27.) GMAC utilized a relocation company, Defendant Argonaut, to provide assistance to transferred employees to help make moving as easy as possible. (*Id.* at 25, 26.) In June 1997, Mr. Sessions applied for Argonaut's relocation services by completing certain forms, including a Homeowner's Property Disclosure form ("Disclosure Form"). (*Id.* at 28–29.)

The preamble of the Disclosure Form states:

In connection with my/our relocation, I/we make the following disclosures to

the best of my/our knowledge regarding my/our property with the knowledge that even though this is not a warranty, prospective Buyers may rely on this information to decide whether or on what terms, to purchase the property.

(Mr. Sessions Dep., Ex. 10.) The Disclosure Form further provides:

The above information is true and correct to the best of my/our knowledge and, except as set forth herein, no material problems exist with respect to the property as of the date set forth below. I/we hereby authorize the furnishing of the foregoing information to any prospective purchaser, your listing agent, or an agent of Argonaut Relocation Services.

(*Id.*)

The following question is on the Disclosure Form: "Is there, or has there been, a drainage problem or flooding on your property?" Mr. Sessions wrote "Yes" as to the land. The form further directs: "If yes to any of the above, you must explain." In response to this question, Mr. Sessions wrote the following: "creek on back of property (200′ from house) left its banks during hurricane 2 years ago but has not been a problem since City cleaned out drain pipe at Saunders Road." (Mr. Sessions Dep., Ex. 1.)

Mr. Sessions read each section of the Disclosure Form and completed and signed the form on June 26, 1997. (*Id.* at 33, 34, 36; Pls.' Resp. at 5.) Mr. Sessions understood that the Disclosure Form would be presented to prospective purchasers. (Mr. Sessions Dep. at 34, 35.) Mrs. Sessions also read and signed the form. (*Id.* at 34.)

Mr. Sessions' primary contact at Argonaut was Ron Northey ("Mr.Northey"). (*Id.* at 29, 31.) When the Sessions returned the Disclosure Form to Argonaut, Mr. Northey briefly reviewed the Disclosure Form and placed it in Mr. Sessions' file. (Northey Dep. at 13.) Argonaut subsequently obtained appraisals on the Sessions' property. (*Id.* at 19.) One of the appraisers, James Moore ("Mr.Moore"), inspected the property on July 15, 1997. (*Id.* at 41.) Mr. Moore advised Argonaut that the inspection occurred after a rain and that the yard from the rear of the deck to the back of the property was wet and spongy. (*Id.* at 23.)

The property was placed on the market and shown to prospective purchasers throughout July and August 1997. (Mr. Sessions Dep. at 43.) Some prospective buyers declined to buy the property because of the sogginess and wetness in the backyard. (*Id.;* Northey Dep. at 2, 3, 28.)

In late August or early September 1997, Mr. Wheelan began looking at the property. (Mr. Wheelan Dep. at 22.) The Wheelans were first-time home buyers, and Mr. Wheelan handled the majority of the purchasing details on their behalf. (Mrs. Wheelan Dep. at 18, 20.) Mr. Wheelan looked at the house approximately one dozen times and walked around the backyard approximately six times, and Mrs. Wheelan looked at the house once, prior to entering into the contract to purchase the property. (Mr. Wheelan Dep. at 19.) It did not rain during the time when the Wheelans made their visits to the property. (*Id.* at 22.)

On September 11, 1997, the Wheelans agreed to purchase the property for $100,-600 (*Id.* at 27, 29), and Mr. Wheelan signed the sales contract on behalf of himself and his wife. (Mrs. Wheelan Dep. at 19.) After the sales contract was signed, Argonaut provided the Wheelans with the Disclosure Form for their review and signatures. (Northey Dep. at 32.) Mr. Wheelan reviewed and signed the Disclosure Statement for both himself and his wife on September 18, 1997. (Mr. Wheelan Dep. at 36.) On September 22, 1997, Mr. Wheelan had Robert Hall, a certified real estate appraiser, appraise the property. (Pls.' Resp. at 8.) Mr. Hall appraised the property at a value of $103,500. (*Id.* at 8.) The transaction was closed and the sale concluded on September 30, 1997. (Northey Dep. at 30.)

The Wheelans moved into the property on November 15, 1997. (Pls.' Resp. at 7.) Shortly thereafter, it rained, and the Wheelans for the first time discovered the drainage problem. (Mrs. Wheelan Dep. at 22.) "Any time it rains or any kind of water, [the land has] water that puddles, sits, moves, stays in [the] yard. Even weeks after it doesn't rain—or weeks after the last rain, it still stays soft, muddy, swampy." (Mr. Wheelan Dep. at 21.) According to the Wheelans, this occurs every time that it rains. (*Id.*)

Mr. Wheelan had Ellenburg Construction Company provide him with an estimate of cost to correct the drainage problem. (Pls.' Resp. at 8.) The estimate was for $15,000. (*Id.* at 8.) The Wheelans' appraiser, when informed of the drainage problem, revised his estimate to be "$103,-500.00 less the cost to correct such drainage problem." (Hall Aff. ¶ 3.)

## DISCUSSION

### I. Whether Plaintiffs satisfy the elements of fraudulent misrepresentation

█ Under Alabama law, the elements of fraudulent representation are: (1) a false representation, (2) of an existing material fact, (3) that is reasonably relied upon, and (4) damage resulting as a proximate cause. *See Ford Motor Credit Co. v. Adamson Ford, Inc.,* 717 So.2d 781, 788 (Ala.1997), *modified, Foremost Ins. Co. v. Parham,* 693 So.2d 409, 421 (Ala.1997). Generally, whether fraudulent misrepresentation occurred is a "question[ ] of fact, to be answered by examining the evidence adduced at trial in the light most favorable to [the nonmovant]." *Marriott Corp. v. Dasta Constr. Co.,* 26 F.3d 1057, 1065 (11th Cir.1994).

Defendants argue that Plaintiffs fail to satisfy the elements of fraudulent misrepresentation. First, Defendants claim that they did not make a false representation. Second, they contend that there was no reliance on the alleged misrepresentation or, alternatively, that any reliance was unreasonable. Finally, Defendants argue that Plaintiffs fail to show damages proximately resulting from the alleged misrepresentation. The court considers these arguments in turn and finds that Defendants' Motion For Summary Judgment is due to be denied.

### A. *False representation*

Defendants claim that the information provided on the Disclosure Form was "truthful information that can be interpreted in more than one way. Scott Wheelan could have and should have asked for clarification or for more information, but he did not." (Defs.' Br. at 19.) Further, "[d]uring Scott Wheelan's deposition, the Plaintiffs' attorney stipulated that the words used on the disclosure form could mean more than one thing." (*Id.* at 19–20.) Defendants assert that:

> Just because words might be false, when interpreted in one manner, does not mean that those same words are false when interpreted in another equally logical manner. The Plaintiffs' burden is to establish that one or more of the Defendants made a false statement of material fact upon which they reasonably relied to their detriment.

(*Id.* at 20.) Plaintiffs argue that the Disclosure Form and the information contained therein "speaks for itself."

█ In reading the Disclosure Form, the court applies ordinary rules of contract construction. "It is settled law that if in its terms a contract is plain and free from ambiguity, then there is no room for construction and it is the duty of the court to enforce it as written." *Ex parte S.C. Ins. Co.,* 683 So.2d 987, 989 (Ala.1996) (citations omitted). Further, "trial courts are not empowered to insert ambiguities 'by strained and twisted reasoning, into contracts where no ambiguities exist.' (citations omitted) It is not a function of the courts to make new contracts for the parties, or raise doubts where none exist." *Id.* (quoting *Commercial Union Ins. Co. v. Rose's Stores,* 411 So.2d 122, 124 (Ala. 1982)).

■ Therefore, the court begins its analysis by examining the Disclosure Form's natural language. First, the Disclosure Form queries, "is there, or has there been, a drainage problem or flooding on your property?" The Disclosure Form then states, "[i]f yes to any of the above, you must explain." The Disclosure Form further states that, "except as set forth herein, no material problems exist with respect to the property as of the date set forth below."

The court also considers the information added by Mr. Sessions. On the Disclosure Form, Mr. Sessions answered the query "is there, or has there been, a drainage problem or flooding on your property" with a "yes" next to land. As explanation, Mr. Sessions wrote: "creek on back of property (200' from house) left its banks during hurricane 2 years ago but has not been a problem since City cleaned out drain pipe at Saunders Road." (Mr. Sessions Dep., Ex. 1.)

The court concludes the reasonable reading of such language to be that the land's drainage problem solely concerned the creek. The natural language of the contract required that any affirmative answer be explained. Mr. Session's explanation for the drainage problems on the land focused only on the creek, and nothing in Mr. Session's answer indicated that the land experienced drainage problems from any additional source. Further, the explicit language of the contract stated that, other than as set forth therein, no material problems existed with respect to the property. Thus, the court concludes that a reasonable person would read the Disclosure Form to indicate that the land's drainage problem stemmed solely from the creek.

The court further notes that the facts demonstrate that the water problem on the property was not limited to creek flooding; rather, the property had drainage problems entirely unrelated to the creek throughout the entire time the Sessions lived there. Thus, the court finds that the representation on the Disclosure Form was a half-truth, and summary judgment is due to be denied as to this issue. *See, e.g., Danley v. Murphy*, 658 So.2d 483, 486 (Ala.Civ.App.1994) (holding that "statements made by the sellers were only a half-truth and, thus, were a misrepresentation of the facts" where sellers told buyers that car had been "smacked" in the front end but failed to inform the buyers of the full extent of the damage).

### B. *Reliance*

Defendants claim that Mr. Wheelan did not reasonably rely on any alleged misrepresentation contained in the Disclosure Form because "[h]e had already made his decision to buy the property before he saw the form." (Defs.' Br. at 22.) The court is not persuaded by this argument.

■ The sequence of relevant events was as follows: on September 11, 1997, the Wheelans entered into the sales contract; on September 18, 1997, the Wheelans received the Disclosure Form; and on September 30, 1997, the transaction was closed. Although the Wheelans received the Disclosure Form fourteen days after they entered into the sales contract, they clearly received the form before closing the real estate transaction. Thus, the court concludes that, had the Wheelans known the true extent of the land's drainage problem, they conceivably could have refused to buy the property before title was transferred. The court finds that an issue of fact exists concerning whether, during those twelve days, the Wheelans relied on the information contained in the Disclosure Form and, therefore, summary judgment is due to be denied on this issue.[1]

---

1. The court is also unpersuaded by Defendants' argument that Plaintiff Mr. Wheelan "understood he was buying the property 'as is'" and thus did not rely on any alleged misrepresentation by Defendants. (Defs.' Br. at 22.) *See Danley,* 658 So.2d at 486 (holding that buyer of used car was not precluded from asserting fraud claim against seller despite "as is" contract).

Defendants also argue that Mrs. Wheelan "is not a proper party Plaintiff and/or has no cause of action in fraud because she could not have relied upon any representation made" since "only Scott Wheelan was involved in making the decision to purchase the home" and Mrs. Wheelan did not even see the Disclosure Form until after the property was purchased. (Defs.' Br. at 16, 18.) Plaintiffs contend that Mrs. Wheelan "falls into the category of third persons who are damaged by misrepresentations made to others." (Pls.' Resp. at 13.) The court agrees with Plaintiffs.

■ Under Alabama law, "it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured." *Thomas v. Halstead,* 605 So.2d 1181, 1184 (Ala. 1992). The Alabama Supreme Court has held that:

> While generally '[a] stranger to a transaction ... has no right of action [for fraud]' there is an exception to this general rule: 'If a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place.'

*Id.* (quoting 37 C.J.S. Fraud § 60 at 344). Thus, "[t]here is a duty not to make a false representation to those to whom a defendant intends, for his own purposes, to reach and influence by the representation." *Colonial Bank of Ala. v. Ridley & Schweigert,* 551 So.2d 390, 396 (Ala.1989); *see also Danley,* 658 So.2d at 486.

■ Under the facts of the present case, construed in the light most favorable to Plaintiff, the court concludes that, even if Defendants did not directly make a misrepresentation to Mrs. Wheelan, Defendants knew or should have known that any misrepresentation made to Mr. Wheelan would reach and influence Mrs. Wheelan. Although Mr. Wheelan was the one to sign the papers, Mr. Wheelan was acting on behalf of both himself and his wife, a fact of which Defendants were aware. Further, the court finds that a question of fact exists regarding whether Mrs. Wheelan relied on said representation because Plaintiffs present evidence that Mrs. Wheelan knew of her husband's confidence in the representations made in the Disclosure Form. (Mrs. Wheelan Dep. at 17.) Therefore, the court finds that Defendants' Motion For Summary Judgment concerning Mrs. Wheelan is due to be denied.

## C. *Reasonable reliance*

Defendants further argue that, even if the Wheelans did rely, such reliance was not reasonable because:

> Given the lay of the property, its natural decline or slope towards the creek in the back, the fact that Scott Wheelan knew about the creek in the back, and had ample opportunity to observe the property and to have it inspected or reviewed by a professional, and the notice of a drainage problem given by the disclosure form itself, Scott Wheelan did not 'exercise some measure of precaution to protect [his/his wife's] interests.'

(Defs.' Br. at 26–27 (quoting *Torres v. State Farm Fire & Cas. Co.,* 438 So.2d 757, 759 (Ala.1983)).)

■ In *Foremost,* the Alabama Supreme Court articulated that the "reasonable reliance" standard "most closely associated with *Torres,*" is the appropriate reasonable standard to be applied in a misrepresentation case. 693 So.2d at 421. In *Torres,* the Alabama Supreme Court held that, "[i]n order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." 438 So.2d at 759.

The court finds that, under the facts construed in the light most favorable to Plaintiffs, Plaintiffs exercised reasonable care because the drainage problem was not so obvious that Plaintiffs were placed on notice thereof. For instance, the court notes that Plaintiffs' appraiser, a certified

real estate appraiser, failed to note the "obvious" drainage problem when making his appraisal of the property. The evidence demonstrates that the appraiser only became aware of the property's drainage problem when informed of same subsequent to making his appraisal. (Hall Aff. ¶ 3.)

Further, the court concludes that awareness of the creek in the back of the property would not serve to put a reasonably prudent person on notice of a drainage problem that is entirely unrelated to the creek. Finally, the court finds that the information provided on the Disclosure Form would not serve to put a reasonably prudent person on notice of a drainage problem on the property. As previously discussed, although the Disclosure Form states that there was a "drainage problem or flooding" on the land, the court determines that the information on the Disclosure Form could reasonably be construed to indicate that such problem concerned solely a flooding of the creek. Further, the information supplied by Mr. Sessions indicated that said problem had been cured two years prior to the sale. Therefore, the court finds that Defendants' Motion For Summary Judgment on this matter is due to be denied.

### D. *Damages*

Defendants argue that Plaintiffs have not suffered any damages proximately resulting from any representation because "Plaintiffs have not tried to sell the property and, at best, Scott Wheelan is speculating that he would be unable to sell the property. Also, Scott Wheelan has failed to mitigate any damages he might have because he has failed to have the alleged water problem repaired." (Defs.' Br. at 27.) Plaintiffs contend that "the measure of damages in a fraud case is the difference between the value of the property as it was represented and its actual value." (Pls.' Resp. at 16.) Further, Plaintiffs claim that they are "also entitled to recov-

er all damages which were within the contemplation of the parties or which were the necessary or natural proximate consequence of the fraud." (*Id.*)

First, the court addresses Defendants' argument concerning speculative damages. While "[i]t is true that damages may be awarded only where they are reasonably certain" and "may not be based upon speculation ... [,] '[t]his does not mean that the plaintiff must prove damages to a mathematical certainty or measure them by a money standard. Rather, he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference.'" *Jamison, Money, Farmer & Co. v. Standeffer*, 678 So.2d 1061, 1067 (Ala.1996) (citations omitted). Further, "[t]he rule that one cannot recover uncertain damages relates to the nature of the damages, and not to their extent. If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery." *Id.* (citations omitted).

Plaintiffs provide evidence showing that the property has been and continues to be damaged by the drainage problem. For instance, Plaintiffs provide an estimated cost to repair said drainage problem. Plaintiffs further provide an appraisal of the house that accounts for the drainage problem, which is $103,500 minus the cost to repair the drainage problem. (Hall Aff. ¶ 3.) The court thus concludes that Plaintiffs' claim of damages is sufficiently specific to withstand summary judgment.

The court next considers Defendants' argument that Plaintiffs failed to mitigate damages and finds this argument also to be unpersuasive.[2] Under Alabama law, "mitigation of damages is not applicable in a case ... where the measure of damages is the market value of the property before and after the damage." *Danley*, 658 So.2d at 487. Here, Plaintiffs claim

---

**2.** The court notes both that Defendants fail to provide any case law in support of this argu-

ment and that Plaintiffs fail to address this argument at all.

that the market value of the property has decreased as a result of the drainage problem. Thus, the court finds that Defendants have failed to show that Plaintiffs were under any duty to mitigate their market value damages and, therefore, summary judgment is due to be denied on this issue.

## II. Whether Defendants Argonaut and Mrs. Sessions Made Misrepresentations

Defendants claim that neither Defendant Argonaut nor Defendant Mrs. Sessions made any representation to Plaintiffs and, therefore, neither could they have made any alleged misrepresentation. According to Defendants, the alleged misrepresentation on the Disclosure Form "was written by Stan Sessions, not by Lynn Sessions and not by Argonaut." (Defs.' Br. at 12.) Thus, Defendants contend that, "[w]ithout a false representation being made, by the individual Defendant, a Defendant cannot be guilty of fraud." (Defs.' Reply at 16.)

Concerning Mrs. Sessions, Plaintiffs argue that she made the same misrepresentation that Mr. Sessions allegedly made. Mrs. Sessions lived in the house from 1991 until 1997 and "experienced the drainage problems ... the entire time that they lived there." (Pls.' Resp. at 12.) Further, Mrs. Sessions read the Disclosure Form and signed it. (*Id.* at 12.)

Regarding Defendant Argonaut, Plaintiffs proffer the following to support their contention that it made the same misrepresentation. Argonaut required that the Disclosure Form be completed and returned to them to be presented to prospective buyers. The Sessions returned their form to Argonaut in June 1997. Mr. Northey of Argonaut reviewed the Disclosure Form. In early August 1997, Argonaut was advised of the drainage problem by their appraiser and by the realtor offering the home for sale. Subsequently, Argonaut transmitted the Disclosure Form to the Wheelans for their review and signature.

 The court finds that, pursuant to the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that both Defendants Argonaut and Mrs. Sessions made misrepresentations to Plaintiffs. Mrs. Sessions signed the Disclosure Form, which explicitly stated that she had knowledge of the information contained therein. Further, Defendant Argonaut was well aware of the drainage problem, yet disseminated to Plaintiffs the Disclosure Form, which form failed to indicate such problems. Therefore, the court finds that Defendants' Motion For Summary Judgment is due to be denied with regard to Defendants Argonaut and Mrs. Sessions.

### *ORDER*

Based on the foregoing, it is hereby CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby DENIED.